PEOPLE v. NEW YORK BUILDING LOAN BANKING CO.

In re EHRET et al.

(Supreme Court, Appellate Division, First Department. June 7, 1907.)

1. BUILDING AND LOAN ASSOCIATIONS—INSOLVENCY—SHAREHOLDERS—ESTOPPEL.

Though building and loan association shares are illegally issued, those who take them and accept the benefits conferred may not assert their illegality to the prejudice of third persons.

**2. SAME—PRIORITY.**

Holders of building and loan association shares were entitled to semiannual dividends on the amount paid in, and after all their dividends should be paid one-half of the surplus profits was to be credited to them in proportion to the amount paid in until the credits and total payments should amount to the par value of the shares, when payments should be made in cash. Half the surplus profits were to be held as a reserve fund, to be divided among the shareholders on dissolution of the corporation. Any balance in the fund remaining after the payment of the company's other obligations was to be distributed among them pro rata. The resolution authorizing the shares to issue recited that it was desirable that the company have permanent capital to serve to guaranty its obligations, and provided that the shares should be entitled to the further dividends in consideration of the guaranty to other classes of shares, and that the sums paid in should not be withdrawable, but should constitute a fund to guaranty the payment of all the company's obligations. *Held*, that the shareholders under such resolutions were not entitled to share equally with the other shareholders in the assets of the corporation on its dissolution.

**3. SAME—EVIDENCE.**

That the board of directors voted down a resolution, amending a resolution authorizing the shares to issue, specifically providing that the capital should serve as a guaranty of the company's obligations to other shareholders, was not evidence that it was not intended that the first class of shareholders should guaranty the other classes.

**4. SAME.**

There having been an express contract between the holders of the shares issued under the resolution and the corporation that they should not share equally with other shareholders, the insolvency of the corporation did not terminate the contract of guaranty to the other classes of shares.

Appeal from Judgment on Report of Referee.

Action by the people of the state of New York for the dissolution of the New York Building Loan Banking Company. George Ehret and others, shareholders of defendant company, appeal from an order affirming an interlocutory report of a referee. Affirmed.

See 100 N. Y. Supp. 459.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and LAMBERT, JJ.

Fredric W. Hinrichs, for appellants Ehret and others.

Frederick B. Woodruff, for appellants Plant and others.

Howard Chipp (Charles W. Dayton, Jr., on the brief), for respondents.

McLAUGHLIN, J. This action was brought for the dissolution of the New York Building Loan Banking Company, a domestic corporation, which, in February, 1904, was adjudged insolvent, a dissolution decreed, and a receiver appointed. A referee was appointed to take and state the accounts for the first year of the receivership and to report on disputed claims. The referee reported that all claims of class W shareholders should be disallowed, that such shares were legally issued, and that the holders thereof were not entitled to participate in the distribution of funds of the corporation until all other creditors and shareholders had been paid in full. The report was confirmed, and the holders of class W shares appeal.

The question presented involves the determination of the rights and

liabilities assumed by the holders of class W shares. It is contended on behalf of some of the appellants that class W shares were never legally issued, but I do think they are in a position to raise that question. The corporation in good faith at least attempted to comply with all the requirements of law in issuing such shares, and the holders accepted the same and participated in whatever benefits accrued until the corporation became insolvent. I am of the opinion that these shares were legally issued; but, if they were not, those who took them and accepted the benefits conferred cannot now be heard to assert their illegality to the prejudice of third parties. If the corporation had succeeded, and by reason thereof the shares had become valuable, there can be no doubt that the holders would have insisted, and would have had a right to insist as against the corporation and the other shareholders, that, although the proper formalities were not observed in the issue, their rights were nevertheless fixed by the agreement under which they took their shares. It is therefore unnecessary to discuss the legality of the issue of these shares, since a court of equity will not permit the claimants to set up such claim.

Class W shares were issued to provide a fixed capital for the corporation. The subscribers were required to pay one-third of the par value of their shares at the time they subscribed, and the balance was payable thereafter in monthly installments. The holders of such shares were entitled to semiannual dividends of $3\frac{1}{2}$ per cent. on the amount paid in, and, after all other dividends were paid, one half of the net surplus profits was to be credited to them in proportion to the amount paid in until the credits and total payments amounted to $100, the par value of the shares, when the payments to them were to be in cash. The other half of the net surplus profits was to be held as a reserve fund until it amounted to $1,000,000, and thereafter the whole net surplus profits were to be divided among the class W holders. In the event of the dissolution of the corporation, any balance of the reserve fund remaining after the payment of the other obligations of the company was to be distributed among them pro rata. The sums paid in on these shares up to their par value were not withdrawable. It was a permanent fund for the use of the corporation. Most of the shares were issued in 1900, and the interest dividends were paid down to February, 1903.

The appellants' contention is that they are entitled to share equally and ratably with the other shareholders in the assets of the insolvent corporation. The court below, in confirming the report of the referee, held they were not; and I am of the opinion that such conclusion is correct. The purpose of the issue of the class W shares was to guaranty the obligations of the corporation and to provide a permanent working capital. The resolution of the board of directors authorizing the issue, which was afterwards incorporated into the articles of association, commenced with the preamble:

"Whereas, it is desirable that this company shall have a permanent capital that shall serve as a guaranty of the performance of its obligations."

It provided that the shares were entitled to the further dividends "in consideration of the guaranty to the other classes of shares arising

from the creation of these shares," and that the sums paid in should not be withdrawable, "but shall constitute the guaranty fund of the said company, and shall be and stand as a guaranty for the payment of all the obligations of the company." The stock was called "Guaranty Capital Stock," and in view of the unmistakable terms used in the resolution regarding it, which were thus inserted in the articles of association by amendment, I think the only reasonable interpretation is that these shares were not to be paid, in case of a dissolution, until all other obligations of the corporation, including the other classes of shares, had been paid in full.

It is true that the board of directors did not pass a resolution amending the preamble by adding the words, "including its obligations to the holders of all other classes of shares under the articles of association," and the appellants insist that, while this was not done at the meeting which adopted the resolutions and amended the articles, it is nevertheless controlling evidence that it was never intended that the class W shares should guaranty the other classes of shares. I do not think this necessarily follows. The body of the resolution provided that the stock was to stand as a guaranty for the payment of all the obligations of the corporation, and that the further dividends were to be paid "in consideration of the guaranty to the other classes of shares." These words are sufficiently plain, and the neglect to pass, or the rejection of, the proposed amendment, may quite conceivably have been because it was regarded as mere surplusage, and not because it did not state the correct intention. And, whether it did or not, it was not binding on the corporation, and would be a forced construction to say, that all the obligations of the corporation meant only the obligations to third parties, especially in view of the nature and manner in which the business of the corporation was conducted. It would not only be a forced construction, but one which I think the court would not be justified in adopting, to say that the "guaranty to the other classes of shares," in consideration of which this stock was entitled to extraordinary dividends, meant a guaranty only that the debts to third parties should be paid. And it seems this was the view at one time of the holders of a large majority of class W shares; for, when the insolvency proceedings were about to be instituted, they signed certain declarations to the effect that class W shares were not a liability of the corporation and ought not to be considered in determining its solvency, asserting that they were held solely under sections 3 and 4 of article 29 of the articles of association as amended, which were practically identical with the resolution of the board of directors authorizing their issue; that the fund represented by the shares was not withdrawable, that the holders were entitled only to profits actually earned, and therefore the shares were not a liability of the corporation.

The appellants also contend that upon the insolvency of the corporation its assets ought to be distributed pro rata among all the shareholders, and that, even if there were a contract of guaranty to the other classes of shares, it was terminated by the insolvency of the corporation. As a general rule, this contention—nothing appearing to the contrary—would be sound; but it has no application here, if the fore-

going views be correct, because there was an express contract between the holders of class W shares and the corporation that they should not share equally with the other shareholders. The guaranty to the other shareholders could mean nothing, except in case of a dissolution. No injustice has been done to the holders of class W shares by refusing to permit them to share ratably with the other shareholders. Their shares were entitled to a regular 7 per cent. cash dividend. They paid only a fraction of its par value, the balance being payable in small monthly installments, and half the net surplus profits of the corporation were to be divided among them, first as credited payments upon their shares until the par value was paid, and after that in cash. The other half was to be accumulated in a reserve fund, and in the event of the dissolution of the corporation, after the payment of its debts, this fund, or the balance of it, was to be divided among them. After the fund reached $1,000,000, the whole of the net surplus profits of the corporation was to be divided among them. If the corporation prospered, the class W shares would be very valuable. If it did not, then the class W shares stood as a guaranty of the corporation's obligations, and the holders could not participate in the distribution of its assets until all other claims were paid. For those who had confidence in the stability and success of the corporation, this was an attractive arrangement. It would, as it seems to me, be most inequitable to now permit the holders of class W shares to repudiate the agreement under which such shares were issued and place them on the same footing with other shareholders. Having accepted and retained the benefits, they now must submit to the liabilities which such shares imposed.

The order appealed from, therefore, should be affirmed, with $10 costs and disbursements. All concur.